The Acme Pie Company of Cleveland, Ohio v. Commissioner.
Acme Pie Co. v. Commissioner
Docket No. 6529.
United States Tax Court
1946 Tax Ct. Memo LEXIS 90; 5 T.C.M. (CCH) 760; T.C.M. (RIA) 46214; August 30, 1946
*90 R. F. Andes, Esq., 706 Griswold Bldg., Detroit 26, Mich., for the petitioner. W. W. Kerr, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1942 in the amount of $2,105.48, resulting from the disallowance, in part, of a deduction claimed for salaries paid to two of its principal officers, and an allowance for traveling expenses paid to one, and the disallowance of certain claimed deductions for ordinary and necessary business expenses. Findings of Fact Some of the facts have been stipulated by the parties, and we find them to be as stipulated, including in these findings such facts derived from the stipulation and from the evidence introduced at the hearing as are essential to an understanding of the issue. Petitioner is an Ohio corporation, with its principal place of business in Cleveland. It filed its income tax return for 1942 with the collector of internal revenue for the eighteenth district of Ohio at Cleveland. During 1942, there were outstanding 293 shares of capital stock, of which 148 shares were owned by John P. Homchis, Sr., and 1 share *91 by Mary, his wife; and 143 shares were owned by John P. Homchis, Jr., and 1 share by Marie, his wife. John P. Homchis, Jr., was president of petitioner and John P. Homchis, Sr., was vice-president and treasurer. Their compensation for 1942 was fixed by a resolution of the board of directors on January 5, 1942, which provided that the compensation of John P. Homchis, Jr., as president should be "an amount equal to 2 1/2% of the production of the company, but in no event to exceed $15,000.00, plus travelling expenses which shall in no wise exceed $50.00 per week;" and, as to John P. Homchis, Sr., for his services as vice-president and treasurer, the resolution authorized as compensation "an amount equal to 1 1/2% of the production of the company, but in no event to exceed $10,000.00." Pursuant thereto, petitioner paid to John P. Homchis, Jr., for his services as president, the sum of $12,516.64, and $2,600 for traveling expenses, and to John P. Homchis, Sr., as vice-president and treasurer, the sum of $9,266.64. Respondent disallowed as a deduction for salaries the aggregate amount of $5,783.28, reducing the amount allowable as a deduction on account of salary to Homchis, Jr., *92 to $10,000, and on account of Homchis, Sr., to $6,000. John P. Homchis, Sr., has been engaged in the bakery business since 1915, except for a period of interruption at the time of the first World War. He had operated several bakeries in Detroit as an individual proprietor, until 1924, shortly after The Acme Pie Company of Detroit was opened, when he took a partner. They incorporated that business in 1930, and in 1938 Homchis, Sr., bought out the interest of his associate. The Acme Pie Company of Detroit was active in 1942, the tax year involved here, and its stock was owned by Homchis, Sr., his wife, and his daughter. The Detroit company was operated, during the tax year, under the active supervision and management of Homchis, Sr., who was its president, and who devoted about 60 percent of his time to its affairs, and about 40 percent to the business of the petitioner. John P. Homchis, Jr., was occupied principally with the management of the petitioner's business in 1942, devoting about 75 percent of his time to petitioner and about 25 percent to the business at Detroit. Homchis, Sr., did most of the purchasing of supplies for both corporations. He bought berries in Michigan, *93 apples in New York, Indiana, Illinois, and Michigan; cherries in New York and Michigan; other fruits in Canada; buying at the orchards before the fruit is harvested, in order to secure fruit of the best quality and in the best condition, at the most advantageous prices. Apples are bought, shipped and kept in storage in Detroit and Cleveland for daily use throughout the year. He also buys the other bakery supplies used in the business, including flour, sugar and shortening. These supplies, purchased for petitioner, cost in excess of $200,000 per year. In order to secure them, Homchis, Sr., drove from forty to fifty thousand miles in 1942. He worked extremely long hours seven days a week on behalf of both companies. Although petitioner and the Detroit company employ sales managers, plant superintendents, bookkeepers and accountants, it is Homchis' custom to keep in close and familiar touch with every phase of both businesses. He visited petitioner's place of business three or four times a month, and called by long-distance telephone frequently. Once during the year, he spent about a month at the petitioner's plant, while his son replaced him in Detroit. In addition to his usual duties, *94 Homchis, Sr., has exercised mechanical and inventive ingenuity in designing new equipment for the use of both petitioner and the Detroit company. He designed and secured a patent on a new type of carton for the packing of four-inch pies. Both companies were allowed the use of the boxes without the payment of any royalty, and the use of the new boxes by petitioner resulted in a saving of more than $4,500 in 1942. He also designed an aluminum device for removing 25 pies from the oven at one time, instead of five at one time which were handled by the equipment formerly used for that purpose. The use of the new device required only one-third the number of laborers formerly needed, and resulted in a substantial decrease in the number of pies broken in the process of removal. He also designed a bagging machine, of which petitioner and the Detroit company each uses two, and of which they have the exclusive use. The bagging machine was built according to Homchis, Sr.'s, specifications, and he then arranged a device by which the bags are automatically opened by the use of air. The use of these machines by petitioner has reduced the number of girls required for the work from 28 to 14 or 15, *95 although the volume of work has increased. John P. Homchis, Jr., was 24 years old during most of the tax year in question. He had become president of petitioner in 1938, and served as such until December 1, 1943. He was graduated from college on June 7, 1938, having majored in Economics. He had worked for his father's company in Detroit during summer vacations from school since 1934, and during part of his college terms, he worked afternoons during the school year. He worked as an odd laborer in Detroit, working in all departments in order to learn the business. After his graduation from college, he came to Cleveland to live and to assume his position with petitioner. He coordinated and supervised all the activities of all the departments, contacted other bakeries, who are petitioner's most valuable customers, and, with his father, formulated labor policies and sales policies. He did some buying. Although the corporation had a sales manager, Homchis, Jr., himself contacted prospective customers. Operating conditions were beginning to be more difficult in 1942 than theretofore, due to rationing and the loss of experienced personnel to the military service. He worked approximately *96 10 hours a day of which 75 percent was on behalf of petitioner. He traveled an average of almost a thousand miles a week on petitioner's business, to Rochester and Syracuse, New York; Bradford, Warren, Altoona, Pennsylvania; and Cumberland, Maryland, as well as in Ohio cities where petitioner had wholesale customers. He and his father loaned money to petitioner which was unable to secure bank loans. of petitioner corporation: The following tabulation shows pertinent financial statistics Salaries
Dividends
Year
Gross Sales
Net Income
J.P.H., Jr.
J.P.H., Sr.
Paid
Surplus
1937
$668,925.90
$1,385.88
$7,500.00
1938
496,180.06
4,627.80
$ 883.33
8,501.66
1939
595,217.17
1,112.87
6,700.00
2,600.00
($ 4,461.86)
1940
569,278.91
( 5,782.55)
7,850.00
2,606.67
( 10,089.43)
1941
658,588.19
9,021.40
9,850.00
5,733.33
$5,00
1,274.60
1942
658,774.18
595.43
12,516.64
9,266.64
2,052.42
Petitioner leased the premises on which it conducted its business in Cleveland, under a written lease dated November 1, 1936, and ending October 31, 1946, which provided that the lessee "at its own expense make all interior repairs *97 and repair all broken globes, glass and fixtures with material of the same size and quality as that broken, and will keep the interior of said premises in good repair, at its own expense. * * * The lessee agrees to keep and maintain the boiler and the stock and the heating equipment and system now located upon the demised premises in good repair, and to replace any broken or worn-out parts or materials." Pursuant to these requirements, petitioner spent $671.63 for labor, material and equipment to calk seams, rivets; installation of new tubes, new steam gauge and safety relief valve on the boilers all pursuant to a billing dated September 8, 1942. Petitioner spent $146 for removing old doors and installing new overhead doors pursuant to a billing dated May 21, 1942. Petitioner spent $670.39 in the same year for the purchase of an electric motor. On July 28, 1942, petitioner was billed for $779.41 for labor and material in connection with the furnishing and installation of one "condensate return system complete with condensate tank * * * Turbine pump 2 HP 220V-60 cycle 3 phase motor, base and couplings"; one sump pump; rewinding and repairing two motors burned out. On February 21, 1942, petitioner *98 was billed for $195 for furnishing labor, material and equipment to disconnect one boiler, taking out old tubes, clean out scale, furnish and install new tubes and reconnect the boiler; also the sum of $250 for condensate return pump with base, motor and coupling; condensate return tank with automatic make-up control. There were further expenditures totalling approximately $51 for new water gauge fixtures, new tri-cocks, new stack damper, new gate valve, steel baffles, blow-off cock, new mercoid tube, and labor. The expenditures made by petitioner on account of repairs and replacements billed to it under the dates of September 8, 1942, and February 21, 1942, in the total amount of $866.63, were ordinary and necessary business expenses, properly deductible by petitioner during the taxable year. Opinion KERN, Judge: The first of the two issues presented here relates to the respondent's disallowance of $2,516.64 of the deduction claimed by petitioner on account of salary paid its president, and $3,266.64 of salary paid its vice-president and treasurer. The total amounts paid to its president were $12,516.64 paid as salary, and $2,600 paid as traveling expenses, and to the vice-president, *99 $9,266.64. With respect to the deductions claimed by reason of the compensation paid the president, the vice-president and treasurer, we have considered all the pertinent facts, including the nature of petitioner's business, the experience, training and qualifications of the individuals, the character of their services and the fact that they devoted only 75 percent and 40 percent, respectively, of their time to the business of the petitioner, the fact that they owned 291 of the 293 shares of outstanding stock, that their salaries in different years were fixed at varying percentages of the business done, that no dividends were paid, that the corporate surplus, though slightly increased over 1941, was small, and its working capital apparently was insufficient to enable the corporation to operate without borrowing back from the same officers to whom these salaries were paid, being unable to secure loans from a bank, and that although the corporate net income for 1942 would have been less in 1941 if the same salaries had been paid the officers, salaries were increased by a total of more than $6,000. Petitioner was engaged in the business of manufacturing and distributing pies. It had *100 a manufacturing plant and a distribution system. Capital was issued in petitioner's business. The record does not show the amount of the capital but the facts to which we have already referred indicate that the use of capital was necessary to the operation of petitioner's business. Its success did not depend solely on the personal efforts of its officers. However, while petitioner paid to its officers-stockholders the largest salaries in its history no dividend was declared as such on its capital stock. Not only was no provision made in the taxable year for any return by way of dividends on the capital invested in petitioner's business (and undoubtedly a considerable amount was required) but it was also impossible for petitioner on account of its salary policy to accumulate additional capital which it needed. In spite of average annual gross sales of over $600,000, since 1937, petitioner's surplus was only $2,000 at the end of 1942. Only one dividend had been paid by it to its stockholders. In the taxable year no dividend was paid as such although its officers and principal stockholders received the largest salaries which it had ever paid, and its gross sales were greater than they *101 had been for five years. While we hesitate to substitute our judgment as to proper corporate salaries for that arrived at bona fide by the directors of a corporation, we cannot escape the conclusion that in this case the salaries paid by petitioner to its officers were unreasonable. We conclude that respondent did not err in disallowing the sum of $5,783.28 of the amount claimed by petitioner for compensation of its officers. Petitioner contends respondent erroneously disallowed its claim for a deduction in the amount of $2,600 paid its president as traveling expenses, on the ground that it constituted additional compensation. We can find no indication in the notice of deficiency that respondent did disallow this amount, or considered it to be included in the compensation of which a part was disallowed. The second question at issue is whether respondent erred in disallowing the deduction as business expenses of certain expenditures made during the tax year. The point at issue is whether they were such expenditures as are deductible as business expenses as petitioner claims or whether they should be capitalized and depreciated over the term of the lease, as respondent contends. *102 The evidence on this issue is most unsatisfactory, and it is not possible to determine from it all the facts necessary to a conclusive determination of the characteristics, tax-wise, of each of the items involved, a lack for which petitioner must suffer. Such items as new overhead doors, new electric motor, new condensate return system, new turbine pump, new sump pump, appear, on their face, to be such as would be properly capitalized, and any facts which might have been helpful to us in determining otherwise are completely missing from the record. We cannot say, from the evidence before us, that respondent erred in disallowing the deduction of these items as ordinary and necessary expenses. However, certain other items which we have identified in our findings appear to be deductible as ordinary and necessary expenses, and in our opinion respondent erred in disallowing these. Decision will be entered under Rule 50.